AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Middle District of Louisiana

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 20-mj-38 |
| Information Associated with the Account | ) | |
| "mbadon@medlogicus.com" that Is Stored at Premises | ) | |
| Controlled by GoDaddy.com, LLC | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____Arizona_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18:1347 | Health Care Fraud |
| 18:1349 | Conspiracy to Commit Health Care Fraud |
| 18:371; 42:1320a-7b | Paying and Receiving Kickbacks Involving a Federal Health Care Program |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of __180__ days *(give exact ending date if more than 30 days:* 01/02/2021 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Jeff, Richards, HHS-OIG

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____

*(specify reliable electronic means).*

Date:   July 14, 2020

*Judge's signature*

City and state:   Baton Rouge, Louisiana

Hon. Erin Wilder-Doomes, U.S. Magistrate Judge

*Printed name and title*

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

IN THE MATTER OF THE SEARCH OF : 
INFORMATION ASSOCIATED WITH THE :   MAGISTRATE NO. 20- mj-38
ACCOUNT "mbadon@medlogicus.com" : 
THAT IS STORED AT PREMISES :   **UNDER SEAL**
CONTROLLED BY GODADDY.COM, LLC :

### AFFIDAVIT IN SUPPORT OF A SEARCH AND SEIZURE WARRANT

Your Affiant, Jeff Richards, being duly sworn, deposes and says as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1)   I make this affidavit in support of an application for a search warrant for information associated with the email account "mbadon@medlogicus.com" (the "TARGET ACCOUNT"), which is stored at premises owned, maintained, controlled, or operated by GoDaddy.com, LLC ("GoDaddy"), an email, website, and cloud services provider that is headquartered at 14455 N. Hayden Road, Suite 219, Scottsdale, Arizona, 85260. The information to be searched is described in the following paragraphs and in Attachment A, attached hereto and incorporated as if fully set forth herein. This affidavit is made in support of an application for a search warrant under the Stored Communications Act, Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require GoDaddy to disclose to the government copies of the information (including the content of communications) further described in Attachment B, attached hereto and incorporated as if fully set forth herein. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2)   I am a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), assigned to the Dallas Region's Baton

Rouge Field Office since 2001. Prior to joining the Baton Rouge Field Office, I served as an investigator with the Louisiana Medicaid Fraud Control Unit from 1997 through 2001. During my tenure as a federal law enforcement officer, I have worked cases with federal, state, and local agencies and have used numerous investigative techniques, such as electronic surveillance, physical surveillance, interviews of witnesses, use of confidential informants, analysis of phone, bank, and other records, and execution of search and seizure warrants.

3)      I am a member of the U.S. Department of Justice's Baton Rouge Medicare Fraud Strike Force, which includes Special Agents from HHS-OIG, the Federal Bureau of Investigation ("FBI"), and the Louisiana Department of Justice's Medicaid Fraud Control Unit ("MFCU"). In this role, I am tasked with investigating violations of federal health care fraud laws. I have received extensive training in investigations of fraud related to the United States health care system, including schemes to defraud Medicare and Medicaid.

4)      I am personally involved in this investigation along with other federal agents. The statements contained in this affidavit are based upon a review of both public and private records and interviews conducted by me and other agents of witnesses knowledgeable about the facts underlying this investigation. Because this affidavit is provided for the limited purpose of establishing probable cause for a search warrant, it does not include every known fact concerning this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause.

5)      Your Affiant has been investigating the activities of MedLogic, LLC ("MEDLOGIC"), physically located in the Middle District of Louisiana, as well as its owner, Malena Lepetich, also known as Malena Badon ("LEPETICH"), as part of a joint investigation with HHS-OIG, FBI, and MFCU (collectively, the "Investigative Team"). MEDLOGIC is a

diagnostic laboratory that conducts toxicology and other types of testing, and it submits claims for reimbursement to federal and private health care benefit programs.

6)    The investigation has included, among other things, a review of public records, records obtained from third parties, claims data, and records seized or imaged pursuant to search warrants; interviews of witnesses; issuance of grand jury subpoenas; consensual recordings; and physical surveillance.

7)    Based on the results of the joint investigation, summarized in this affidavit, there is probable cause to believe that from in or around April 2017, and continuing through the present, LEPETICH, the person using, receiving, and sending information from the TARGET ACCOUNT, and others, violated Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States and to Pay and Receive Kickbacks), and Title 42, United States Code, Section 1320a-7b (Paying and Receiving Kickbacks Involving a Federal Health Care Program) (collectively, the "TARGET OFFENSES"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes, further described in Attachment B.

## II.    **JURISDICTION**

8)    This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As set forth below, acts in furtherance of the offenses under investigation occurred within the Middle

District of Louisiana, including the submission of fraudulent claims to Medicare and other insurers for laboratory services that were not medically necessary. *See* 18 U.S.C. § 3237(a).

### III.    OVERVIEW OF THE MEDICARE PROGRAM

9)    Medicare is a federally funded health insurance program that provides health benefits to individuals who are 65 years of age or older or disabled, and it is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b). Medicare is administered by HHS through its agency, the Centers for Medicare and Medicaid Services ("CMS").

10)    Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D"). Part B covers outpatient services, including office visits, minor surgical procedures, and laboratory testing, such as urine drug testing, when certain criteria are met.

11)    Medicare, in receiving and adjudicating claims, acts through fiscal intermediaries called Medicare administrative contractors ("MACs"), which are statutory agents of CMS for Medicare Part B. MACs are private entities that review claims and make payments to providers for services rendered to beneficiaries. MACs are responsible for processing Medicare claims arising within their assigned geographical area, including determining whether a claim is for a covered service.

12)    To receive Medicare reimbursements, providers, including clinical laboratories, physicians, and others who provide services to beneficiaries, need to have applied to the assigned MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, must be signed by an authorized representative of the provider. Form 855B contains a certification that states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

13) In executing CMS Form 855B, providers further certify that they "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

14) A Medicare "provider number" is assigned upon approval of the provider's Medicare application. A provider may use that number to file claims with, or "bill" Medicare to obtain reimbursement for services rendered to beneficiaries.

15) When seeking reimbursement from Medicare for provided benefits, items, or services, providers submit the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS").

16) When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are reasonable and medically necessary.

## IV.  OVERVIEW OF THE MEDICAID PROGRAM

17) The Louisiana Medicaid Program ("Medicaid") is a federal and state funded health insurance program designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services, and it is a "health care benefit

program" as defined by Title 18, United States Code, Section 24(b). Medicaid is administered by HHS through CMS.

18)    CMS contracts with the Louisiana Department of Health ("LDH") to manage the Medicaid program in Louisiana, including the enrollment of medical service providers and the processing of claims for services rendered to Medicaid recipients.

19)    Individuals who qualify for Medicaid benefits are commonly referred to as "recipients." Recipients are eligible to receive a variety of services, including hospital services, physician services, laboratory services, and prescription drug benefits at no or low cost.

20)    As part of the Medicaid enrollment process, providers submit provider enrollment applications to Medicaid. Providers are required to certify that any services for which they seek reimbursement from Medicaid are medically necessary. Provider enrollment certifications further state that any false claims, statements, or documents, or concealment of a material fact, can be prosecuted under applicable federal and state laws.

21)    Upon enrollment in the Medicaid program, providers are furnished with a letter containing specific instructions on how to access the "Provider Manual" through LDH's website, which sets forth the terms and conditions under which payment will be made for services rendered.

22)    After agreeing to the conditions set by Medicaid, and upon being certified, a provider is assigned a unique provider number for billing purposes. Upon providing services to Medicaid recipients, Medicaid-enrolled providers submit claims to Medicaid seeking reimbursement for the cost of services rendered using the assigned unique provider number. Claims typically are submitted electronically to a Managed Care Organization, i.e., a fiscal intermediary for Medicaid, which adjudicates the claim on behalf of Medicaid.

23)    When seeking reimbursement from Medicaid, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicaid; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.  If services performed by providers are not reasonable and medically necessary, then they are not appropriately reimbursable by Medicaid.

## V.    LABORATORY TESTING SERVICES

24)    This investigation concerns claims submitted to Medicare for Part B laboratory testing services, namely, urine drug testing, COVID-19 testing, and respiratory pathogen panel ("RPP") testing.

25)    The Social Security Act, Title 42, United States Code, Section 1395y(a)(1)(A) states that no Medicare payment shall be made for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member."  As a condition of Medicare payment, a physician or other Medicare provider must certify that the services ordered and performed were medically necessary. 42 U.S.C. § 1395n(a)(2)(B).

26)    Further, Title 42, Code of Federal Regulations, Section 410.32(a) provides, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."  "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

**Urine Drug Testing**

27)     Urine drug testing is used to detect the presence or absence of a drug in the body or to identify the specific quantity of a drug present in the body.   Drug testing codes in the CPT Manual are designated as either "presumptive" testing or "definitive" testing.

28)     Generally speaking, presumptive, or "qualitative," testing identifies which substances, if any, are present in a provided specimen.   Definitive, or "quantitative" testing identifies how much of a particular substance is present in the provided specimen.

29)     Presumptive testing is performed in a variety of ways, including utilizing devices that are capable of being read by direct optical observation, such as "dipsticks" or "cups" that react to the specimen and identify which drugs, if any, are present, as well as by more complex testing performed by instrument chemistry analyzers.   Definitive testing is performed by higher complexity instrument chemistry analyzers.

30)     Depending on the initial results from presumptive testing, it may, in some instances, be medically appropriate to perform a definitive test to determine the concentration of specific drugs in a patient's system.   The purpose of definitive testing is to confirm any unexpected results (e.g., a positive result for a non-prescribed drug, or a negative result for a prescribed drug) from the presumptive test and determine the concentration of those specific drugs.   For this reason, definitive testing is also commonly referred to as "confirmatory" testing.

31)     Unlike presumptive testing, which can test for multiple drugs in a patient's urine specimen at once, definitive testing requires that a separate test be performed for each different drug.   The equipment needed for definitive testing is more sophisticated than that needed for presumptive testing.   Because definitive testing is more expensive to perform, it is typically reimbursed at a higher rate than presumptive testing.

32)     In certain instances, Medicare considers medically necessary, and appropriately reimbursable, definitive testing of substances that first produced unexpected results during presumptive testing.   Conversely, routine definitive testing of substances that did not yield unexpected results during presumptive testing is not medically necessary and therefore is not appropriately reimbursable.

33)     Novitas Solutions, Inc. ("Novitas") is the MAC for Medicare's Jurisdiction JH, which includes Louisiana and other states.   MACs such as Novitas issue Local Coverage Determinations ("LCDs") governing reimbursement of services in their coverage area.

34)     In March 2014, Novitas issued LCD L34352, "Qualitative Drug Testing."  The LCD states, "[A] qualitative test may be followed by a confirmation with a second method, only if there is a positive inconsistent finding from the qualitative test in the setting of a symptomatic patient." It further states that "[t]here must be a direct correlation between those positive findings generated from initial qualitative testing and those requested quantitative tests to specifically confirm such qualitative findings."

35)     In October 2015, Novitas issued LCD L35006, "Controlled Substances Monitoring and Drugs of Abuse Testing."  The LCD states that "[t]here should be a direct correlation between those positive findings generated from presumptive testing and those requested definitive tests to specifically confirm such findings."  Specifically, qualitative (or presumptive) testing may be followed by quantitative (or definitive) testing "when there is a positive inconsistent finding from the presumptive test in the setting of a symptomatic patient."  Quantitative testing orders "should be individualized based on clinical history and risk assessment and must be documented in the medical record."  Moreover, "[r]outine standing orders" for quantitative testing of "all patients in a physician's practice are not reasonable and necessary."

**COVID-19 and RPP Testing**

36)     In March 2020, the World Health Organization declared COVID-19, also known as coronavirus, a global pandemic.

37)     Based on my training and experience, I know that one emerging scheme to defraud Medicare and other insurers is for laboratories to bill for conducting COVID-19 testing, which is reimbursed at a rate that only minimally covers the cost of testing, as well as for panels of RPP tests, which are reimbursed at a much higher rate.

38)     RPP tests are used to detect certain respiratory viruses and bacterial pathogens. They do not test for COVID-19.

39)     Laboratories performing COVID-19 testing can bill Medicare and other insurers for services that occurred after February 4, 2020, using HCPCS code U0001. This code is only to be used for tests developed by the Centers for Disease Control and Prevention ("CDC"). Laboratories performing non-CDC laboratory tests for COVID-19 can bill for them using HCPCS code U0002. Medicare reimburses approximately $35 per test for U0001 and $51 for U0002.

40)     Medicare reimburses for RPP tests based on the number of respiratory viruses and bacterial pathogens that are tested, with 12 or more tested pathogens generating the highest reimbursement. Most often, RPP panels include testing of 12 or more pathogens and are billed under CPT code 87633. The amount billed by a laboratory to Medicare for RPP testing of 12 or more pathogens can be as high as $2,500.

41)     RPP testing, like all diagnostic testing, must be reasonable and medically necessary.

## VI.    TARGET OFFENSES

### A.    Health Care Fraud

42)    Title 18, United States Code, Section 1347 prohibits health care fraud.  It provides, "Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

a.    to defraud any health care benefit program; or

b.    to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both."

43)    Title 18, United States Code, Section 1349 provides that any person who attempts or conspires to commit health care fraud shall be subject to the same penalties as those set forth in Title 18, United States Code, Sections 1347.

44)    Title 18, United States Code, Section 24(b) defines a "health care benefit program" as "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

### B.    Federal Anti-Kickback Statute

45)    Title 42, United States Code, Section 1320a-7b, often referred to as the Federal Anti-Kickback Statute, prohibits the payment of kickbacks in exchange for federal health care referrals.  The statute generally defines kickbacks as offering, paying, soliciting, or receiving anything of value to induce or reward referrals or generate federal health care program business.

46)    Sections (b)(1)(A) and (b)(1)(B) of the Federal Anti-Kickback Statute prohibit the payment or receipt of "any remuneration" in exchange for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."

47)    Title 18, United States Code, Section 371 prohibits conspiracies to defraud the United States and to pay and receive kickbacks.

48)    When enrolling as a Medicare provider, physicians, clinical laboratories, and others certify that they will comply with the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute.

## VII.    RELEVANT ENTITIES AND INDIVIDUALS

49)    MEDLOGIC is a Louisiana limited liability company registered on August 2, 2012. Its principal place of business is 340 East Parker Street, Baton Rouge, Louisiana 70803.

50)    LEPETICH is a resident of Belle Chase, Louisiana.   She is the owner, Chief Executive Officer, and registered agent of MEDLOGIC.[1]

## VIII.    PROBABLE CAUSE TO BELIEVE THAT A CRIME HAS BEEN COMMITTED

51)    Based on my training and experience, I know that Medicare and other insurers would not have reimbursed claims for laboratory testing had they known that the tests were procured through the unlawful payment of kickbacks and bribes or were not medically necessary.

52)    The investigation to date has revealed that from in or around April 2017, and continuing to the present, MEDLOGIC, through LEPETICH and others, unlawfully caused the submission of claims to Medicare, Medicaid, and other insurers for laboratory services that were not medically necessary, procured through the payment of kickbacks, and not appropriately

---

[1] LEPETICH's criminal history includes arrests for domestic abuse battery and aggravated battery with a dangerous weapon.

reimbursable. This investigation supplies probable cause to believe that one or more crimes have been committed and to search the TARGET ACCOUNT for evidence, fruits, and instrumentalities of those crimes.

### A.    Urine Drug Testing

53)    First, the investigation has supplied probable cause to believe that LEPETICH, through MEDLOGIC, caused the submission of unlawful claims to Medicare, Medicaid, and other insurers for urine drug testing that was not medically necessary and was procured through the payment and receipt of kickbacks.

### Claims Data

54)    From April 14, 2015 through August 9, 2019, MEDLOGIC submitted over $9.4 million in claims to Medicare Part B for diagnostic testing and was reimbursed over $2.3 million.

55)    The majority of claims submitted by MEDLOGIC during this time period pertained to urine drug testing, as the below chart of MEDLOGIC's top ten procedure codes demonstrates.

| Procedure Code | Procedure Code Description | Distinct Claims | Billed Amount | Paid Amount |
|---|---|---|---|---|
| G0483 | Drug Test(s), Definitive; Qualitative Or Quantitative, All Sources, Includes Specimen Validity Testing, Per Day; 22 Or More Drug Class(es), Including Metabolite(s) If Performed | 1,947 | $2,518,482.41 | $381,237.68 |
| G6058 | Drug Confirmation, Each Procedure | 1,528 | $257,926.40 | $222,655.32 |
| G6056 | Opiate(s), Drug and Metabolites, Each Procedure | 1,528 | $161,845.76 | $139,714.80 |
| G0431 | Drug Screen, Qualitative; Multiple Drug Classes By High Complexity Test Method (e.g., Immunoassay, Enzyme Assay), Per Patient Encounter | 1,485 | $145,076.26 | $110,722.16 |

| Procedure Code | Procedure Code Description | Distinct Claims | Billed Amount | Paid Amount |
|---|---|---|---|---|
| G0483 | Drug Test(s), Definitive; Qualitative Or Quantitative, All Sources, Includes Specimen Validity Testing, Per Day; 22 Or More Drug Class(es), Including Metabolite(s) If Performed | 1,947 | $2,518,482.41 | $381,237.68 |
| G0482 | Drug Test(s), Definitive; Qualitative Or Quantitative, All Sources, Includes Specimen Validity Testing, Per Day; 15-21 Drug Class(es), Including Metabolite(s) If Performed | 814 | $723,930.97 | $106,210.96 |
| G6055 | Nicotine | 1,473 | $94,949.58 | $81,931.49 |
| G6031 | Benzodiazepines | 1,528 | $76,919.52 | $66,398.18 |
| 87633 | Detection Test For Multiple Types Of Respiratory Virus | 154 | $436,351.00 | $65,570.07 |
| G6030 | Amitriptyline | 1,487 | $72,446.64 | $62,457.00 |
| G6052 | Meprobamate | 1,487 | $71,316.52 | $61,476.00 |

### Medicaid Audit

56) Community Care Health Plan of Louisiana, Inc., doing business as Healthy Blue ("Healthy Blue"), is a Managed Care Organization that contracts to manage the Medicaid program in Louisiana and adjudicate claims for payment.

57) Beginning in 2017, Healthy Blue conducted an audit of MEDLOGIC's ordering of urine drug testing, and in particular, definitive testing. Similar to Medicare, Healthy Blue covers definitive testing when a "presumptive test was positive for an illegal drug [such as] methamphetamine or cocaine, positive for a prescription drug with abuse potential which was not prescribed, or negative for prescribed medications." In addition, the "specific definitive test(s) ordered" must be "supported by documented rationale for each test ordered [and] clinical documentation [must] reflect[] how the results of the test(s) will be used to guide clinical care."

58)    Based on an initial data review, Healthy Blue found that MEDLOGIC billed for "definitive testing with little or no presumptive testing," and MEDLOGIC's claims showed a "cookie cutter pattern of 32 claim lines [of] definitive testing per member encounter and no presumptive tests."

59)    A review of patient files "confirmed this provider was performing definitive testing panel[s] without performing the required presumptive tests."   The review of 745 claims lines "identified a 100% error rate."

60)    In particular, Healthy Blue found:

- The "MD signature" was "missing on most orders."

- Signatures that were "included were not of those that ordered labs."

- A comprehensive panel was "being ran on everyone even when [the] order was not for [a] Comp Panel."

- "Greater than 50% of labs were not reported until a month after a lab was submitted."

- Orders for comprehensive panels of definitive testing should have been billed using particular CPT codes that "bundle" all of the tests into one claim, yet MEDLOGIC submitted claims for each of the "individual tests." Billing tests individually typically results in a higher reimbursement amount.

- Healthy Blue concluded that the definitive tests reviewed were not medically necessary.

61)    Based on the sample of claims reviewed, Healthy Blue calculated an overpayment to MEDLOGIC of $11,928.24, and it notified MEDLOGIC of the overpayment by letter on August

15, 2019.  According to Healthy Blue, since then, MEDLOGIC "has made no effort to change the billing habits nor repay the overpayment."

### Doctor 1

62)    On May 3, 2018, the Investigative Team interviewed Doctor 1, a doctor who worked as the Medical Director for MEDLOGIC beginning in 2013, around the time when LEPETICH established MEDLOGIC.

63)    Doctor 1 initially met LEPETICH when LEPETICH was working as a sales representative for another company.  LEPETICH explained to Doctor 1 that she wanted to open her own laboratory.

64)    MEDLOGIC performed both qualitative and quantitative urine drug testing.  Upon beginning work for MEDLOGIC, Doctor 1 encountered several issues with the accuracy and quality control of MEDLOGIC's urine drug testing machines but noticed that MEDLOGIC continued billing for these tests.

65)    According to Doctor 1, in 2015, MEDLOGIC hired a consultant to audit the laboratory prior to an inspection.  The consultant was appalled that MEDLOGIC performed so many quantitative urine drug tests without appropriate doctors' orders or indications of medical necessity.  The consultant called it "insane" for the laboratory to be conducting an "exorbitant number of tests" without a doctor's order.

66)    The consultant asked a MEDLOGIC employee responsible for overseeing the laboratory operations why MEDLOGIC was conducting so much testing.  The employee responded, "so we can bill it.  We bill everything."  Another employee responded, "I knew we weren't supposed to be doing this" but LEPETICH had said it was OK.

67)    Doctor 1 informed LEPETICH of the consultant's findings. In response, LEPETICH said, "we are small" and "we will fly under the radar."

68)    In late 2015, Doctor 1 informed LEPETICH that s/he would be resigning from the company.

## Former Employee 1

69)    On October 29, 2019, the Investigative Team interviewed Former Employee 1, who worked as the Manager of MEDLOGIC from in or around 2014 to 2018.

70)    Former Employee 1 stated that MEDLOGIC had agreements to rent space in medical offices that referred specimens for testing. LEPEITCH would meet with the doctors and make all the arrangements.

71)    According to Former Employee 1, LEPETICH thought she was above the law and once said something along the lines of, "MedLogic was too small of a lab to be looked at."

72)    Former Employee 1 stated that s/he communicated with LEPETICH by phone, text message, and email.

## Payment to Sales Representatives for Referrals

### *Sales Representative 1*

73)    On October 22 and 23, 2019, the Investigative Team interviewed Sales Representative 1, who referred specimens for testing by MEDLGOIC. Sales Representative 1 was not an employee of MEDLOGIC but an independent contractor who was paid on a commission basis rather than a salary.

74)    Sales Representative 1 would call on medical practices and solicit them to refer urine specimens to MEDLOGIC for testing. S/he was paid based on the number of specimens

referred to MEDLOGIC, between $25 and $40 per specimen. This included specimens for patients who were covered by Medicare, Medicaid, and private insurance.

75)    In January 2016, Sales Representative 1 signed a contract with MEDLOGIC under which s/he would be paid on a per-specimen basis, despite being an "independent contractor" and not an employee of MEDLOGIC.

---

**2.COMPENSATION.**

        CONTRACTOR shall receive compensation on a commission only basis. The commission shall be a flat rate of $40/ samples reimbursed for testing performed for clients of Med Logic.

---

76)    Based on my training and experience, I know that it is a violation of the Federal Anti-Kickback Statute to make payments in exchange for referrals for testing covered by federal insurance that take into account the volume or value of the referrals.

77)    Checks signed by LEPETICH corroborate Sales Representative 1's statements. For example, on May 15, 2017, LEPETICH wrote a check to Sales Representative 1 for "commission."



78)    On June 15, 2017, LEPETICH wrote a check to Sales Representative 1 for "62 samples." This payment equates to a payment of $40 per specimen referred to MEDLOGIC.



79)     These "commission" payments continued into 2018.



80)     In October 2018, Sales Representative 1 emailed LEPETICH to tell her that Sales Representative 1 was referring approximately 100 specimens per month and to ask when the next payment would be made. Eventually, Sales Representative 1 stopped referring specimens to MEDLOGIC because LEPETICH failed to pay her/him.

81)     Sales Representative 1 confirmed that s/he communicated with LEPETICH via phone, text message, and email at "mbadon@medlogicus.com" (i.e., the TARGET ACCOUNT).

*Sales Representative 2*

82)     On October 23, 2019, the Investigative Team interviewed Sales Representative 2. Like Sales Representative 1, Sales Representative 2 referred specimens to MEDLOGIC for testing and was paid on a per-sample basis. S/he was paid $10 per specimen referred, including for patients covered by Medicare, Medicaid, and private insurance.

*Sales Representative 3*

83)    On November 15, 2019, the Investigative Team interviewed Sales Representative 3.  LEPETICH offered Sales Representative 3 a 25% commission on whatever specimens s/he brought in, included patients insured by Medicare, Medicaid, and private insurance.

84)    LEPETICH sent a contract to Sales Representative 3 via email.  The contract stated that Sales Representative 3 would be compensated "on a commission only basis" based on "net revenue generated on testing performed."

---

**4.    COMPENSATION.**

CONTRACTOR shall receive compensation on a commission only basis.  The commission shall be a percentage of net revenue generated on testing performed for clients of CONTRACTOR: net revenue shall be the rate reimbursed to MEDLOGIC by a private insurer or government agency (e.g. Medicare or Medicaid) per sample generated by sales of CONTRACTOR less $150 per sample.  Commission percentages on a monthly basis shall be as follows:

*Initials* _____          *Independent Contractor Agreement*
                                     *Page 1 of 7*

---

$0 - $40,000.00 in net revenue: 15%
$40,000.01 - $100,000.00 in net revenue: 25%
$100,000.01 - $350,000.00 in net revenue: 30%
$350,000.01 and above in net revenue: 37.5 %

---

85)    Consistent with the contract, Sales Representative 3 received checks from LEPETICH, from in or around May through December of 2017, for "commissions" or "samples." Examples of these checks follow.







## Payments to Physicians for Referrals

### Doctor 2

86)     On June 26, 2017, the Investigative Team interviewed Doctor 2, a doctor based in Pennsylvania.  Doctor 2 claimed that MEDLOGIC owed her/him money for signing up pain management physicians in Pennsylvania to refer urine specimens to MEDLOGIC for testing.

87)     Doctor 2 said s/he had a contract with LEPETICH and MEDLOGIC to send at least 300 urine cups per month to MEDLOGIC in exchange for a payment of $150 per urine cup.  These specimens were from patients covered by Medicare.  According to Doctor 2, LEPETICH paid her/him around $43,000 in total, which was only about half of what was owed.

### Dr. Jorge Contreras

88)     The Investigative Team also obtained information regarding Dr. Jorge Contreras, who referred specimens for testing to MEDLOGIC.  According to Medicare data, Contreras is one of the highest referrers of testing to MEDLOGIC.  From in or around May 2018 through August

2019, Contreras's referrals to MEDLOGIC resulted in over $1.2 million in claims submitted to Medicare.

89)    Based on my training and experience, I know that one way in which clinical laboratories disguise kickback payments is for the laboratories to pay providers to "rent" or "lease" space in the provider's office.  Often, these payments are higher than the fair market value for "renting" or "leasing" the space, and instead are intended to encourage providers to refer specimens to the laboratory for testing.

90)    Sales Representative 3 called on Contreras to refer test orders to MEDLOGIC.  In exchange, Contreras requested that MEDLOGIC pay him $3,000 per month to "rent" space in his office.

> **From:** Jorge Contreras <eastbankprimarycareassociates@gmail.com>
> **Sent:** Sunday, August 12, 2018 9:16 PM
> **To:** ██████████
> **Subject:** rent
>
> ████  Here is my offer.
> 3000  monthly. Paid on the first of the month and paid one month in advance. Let me know when you guys plan on starting as we will have to prepare and prorate. Thank you for your time

91)    A review of bank records reveals that from March 2018 through January 2019, MEDLOGIC wrote at least 14 checks to Contreras totaling $63,333.30.  Most of these checks were for flat amounts such at $3,000, $5,000, and $6,000.  Several of the memo lines state that the checks are for "rent."

92)    MEDLOGIC made similar payments to at least 18 other physicians or clinics for "rent."  These payments totaled $320,724.93.

## Cooperating Witness 1

93)     Cooperating Witness 1 is a resident of South Carolina.  In September 2019, Cooperating Witness 1 was charged in an indictment filed in the Middle District of Louisiana with health care fraud, conspiracy to commit health care fraud and wire fraud, conspiracy to defraud the United States and to pay and receive kickbacks, and receiving kickbacks.  In April 2020, Cooperating Witness 1 signed a statement admitting that s/he referred testing orders to various laboratories in Louisiana and elsewhere in exchange for kickback payments.  Cooperating Witness 1 further admitted that these tests were not medically necessary.  Cooperating Witness 1 is cooperating with the United States, and s/he has been interviewed by the Investigative Team on several occasions.

94)     Cooperating Witness 1 met LEPETICH sometime during 2016.  From in or around April 2016 through October 2016, MEDLOGIC was suspended by CMS from conducting testing after an onsite audit revealed issues with the testing.

95)     Around that time, LEPETICH contacted Cooperating Witness 1 because she wanted to send specimens to another laboratory.  Cooperating Witness 1 put LEPETICH in touch with Acadian Diagnostic Laboratories, LLC ("Acadian"), located in Baton Rouge, Louisiana, to perform the testing.

96)     According to Cooperating Witness 1, LEPETICH was paid a commission rate of around 35% for specimens that were referred to Acadian for testing.  LEPETICH referred specimens to this laboratory during 2016, 2017, and part of 2018.

97)     Records demonstrate that Acadian and Cooperating Witness 1 made payments to LEPETICH based on the volume and value of her referrals, and the TARGET ACCOUNT was used to facilitate these payments.  On February 12, 2018, Cooperating Witness 1 emailed

LEPETICH, at the TARGET ACCOUNT, a spreadsheet showing the reimbursements to Acadian by federal and private insurers for laboratory testing referred by LEPETICH. These payments totaled $15,615.14.



98)    Then, on February 15, 2018, Cooperating Witness 1 directed that payment be made to LEPETICH in the amount of $5,026.51, which equates to approximately 33% of the reimbursements to Acadian.



99)    Based on an analysis of bank records, from November 2016 through February 2018, Acadian paid LEPETICH $347,353.89.

100)    On June 24, 2020, Cooperating Witness 1 placed a consensually recorded call to LEPETICH. During the call, Cooperating Witness 1 proposed referring specimens to MEDLOGIC for testing in exchange for payments. Cooperating Witness 1 discussed her/his past contractual relationship with LEPETICH: "I know how we structured things as far as payment when you ran stuff with us at Acadian, and I think we were charging 13% on [cost of goods sold] and then paying a percentage." In response, LEPETICH said that going forward, "I think that . . . percent of gross is probably, you know, one of the ways we could look at it. I don't know, let's

just look at a couple of different options and I would think that maybe, or we can do that, you know, percentage with your costs, like we did before."

### **Review of Medical Records**

101)    In June 2020, the Investigative Team conducted a review of medical records that were obtained from MEDLOGIC via subpoena, including requisitions and test results, as well as claims data.

102)    MEDLOGIC offers physicians various "panels" of tests, including a "Comprehensive Panel" of thirty drugs for testing, as well as "Panel A," "Panel B," and "Panel C," which each include a smaller amount of drugs for testing.    For example, MEDLOGIC documents state that "Panel A" includes the "Comprehensive Panel less Alcohol Derivatives, Cotinine, [and] THC."    Below is an example requisition for "Panel A" testing, as well as MEDLOGIC's description of "Panel A."

| 4. Test(s) Requested: | | | |
|---|---|---|---|
| Quantitative Confirmation of Drugs by LC/MS/MS - Screening by Immunoassay | | | |
| ☐ Comprehensive Panel | ☑ Panel A | ☐ Panel B | ☐ Panel C |
| ☐ Screening Panel | ☐ Buprenorphine | ☐ Cannabinoids | ☐ Synthetic Cannabinoids |
| ☐ Alcohol Biomarkers | ☐ Nicotine | ☐ Bath Salts | ☐ |
| Validity testing (pH, creatinine, specific gravity) standard with all confirmations. | | ☐ | |

**Panel A:**

Comprehensive Panel *less* Alcohol Derivatives, Cotinine, THC

103)    In several instances, referring physicians ordered something other than the "Comprehensive Panel," yet MEDLOGIC billed Medicaid using the same thirty CPT codes.    In other words, MEDLOGIC billed Medicaid for testing a larger number of drugs than had been ordered by the referring physicians.    For example, despite some physicians ordering "Panel A," MEDLOGIC tested and billed for Alcohol Biomarkers, Cotinine, and Cannabinoids.

104)    The table below depicts examples of requisitions and claims data reviewed by the Investigative Team. For all of these patients, MEDLOGIC billed Medicaid using the same thirty CPT codes associated with the Comprehensive Panel, including when the referring physician instead ordered "Panel A."

| Date of Signature on Requisition | Provider | Test(s) Requested | Unique Tests Billed | Total Paid |
|---|---|---|---|---|
| 11/16/2018 | Ashley Robinson, FNP (Crowe) | Screening Panel | 30 | $524.79 |
| 8/8/2018 | Dr. Contreras | Comprehensive Panel, Screening Panel | 30 | $524.79 |
| 8/29/2018 | Dr. Contreras | Comprehensive Panel, Screening Panel | 30 | $524.79 |
| 11/16/2018 | Dr. Crowe | Screening Panel | 30 | $524.79 |
| 10/23/2018 | Dr. Ikemire | Panel A | 30 | $524.79 |
| 10/23/2018 | Dr. Ikemire | Panel A | 30 | $263.93 |
| 11/15/2018 | Dr. Ikemire | Comprehensive Panel | 30 | $266.93 |
| 12/13/2018 | Dr. Ikemire | Comprehensive Panel | 30 | $524.79 |
| 12/31/2018 | Dr. Ikemire | Panel A | 30 | $266.93 |
| 1/16/2019 | Dr. Ikemire | Panel A | 30 | $524.79 |
| 5/16/2018 | Dr. Nguyen | Comprehensive Panel, Screening Panel | 30 | $524.79 |
| 6/6/2018 | Dr. Nguyen | Comprehensive Panel, Screening Panel | 30 | $524.79 |
| 6/8/2018 | Dr. Nguyen | Comprehensive Panel, Screening Panel | 30 | $0.00 |
| 6/22/2018 | Dr. Nguyen | Comprehensive Panel, Screening Panel | 30 | $524.79 |
| 6/24/2018 | Dr. Nguyen | Comprehensive Panel, Screening Panel | 30 | $524.79 |

105)    Under Title 42, Code of Federal Regulations, Section 410.32(a), "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

**B.    COVID-19 and RPP Testing**

106)    The investigation has also supplied probable cause to believe that LEPETICH, through MEDLOGIC, attempted to bill Medicare, Medicaid, and other insurers for RPP testing that was not actually ordered by a treating physician and not medically necessary.

107)    On April 8, 2020, Employee 1, an employee of MEDLOGIC, filed a hotline complaint with HHS-OIG. Employee 1 alleged that the day prior, LEPETICH asked Employee 2, another employee of MEDLOGIC, to check off additional testing on a patient's requisition that had not been marked by the ordering physician. LEPETICH said that this process needed to be done for each patient that was referred for COVID-19 testing if the patients were covered by insurance.

108)    On May 20, 2020, the Investigative Team interviewed Employee 1.  Employee 1 stated that s/he had recently left MEDLOGIC because LEPETICH requested that Employee 2 add RPP testing to requisitions.  Specifically, LEPETICH told Employee 2 to check off on RPP testing for requisitions received from a clinic in Arkansas.  Employee 1 advised Employee 2 not to check off on RPP testing because MEDLOGIC was only supposed to run and bill for tests ordered by a doctor.  A week or so later, according to Employee 1, LEPETICH again made the same request of Employee 2.

109)    On April 8, 2020, Employee 3, an employee of MEDLOGIC, filed a hotline complaint with HHS-OIG.  Employee 3 alleged that her/his co-worker, Employee 2, had been contacted that same day by LEPETICH.  During a call from LEPETICH, she instructed Employee 2 to mark off a respiratory panel for patients that were tested for COVID-19, only if the patients were using insurance.  The RPP testing was not ordered by a treating physician.  According to Employee 3, Medicaid was the primary insurance carrier that LEPETICH was concerned with charging because Medicaid usually pays in full for the tests.

110)    On April 23, 2020, a person believed to be Employee 3 filed another complaint, alleging that LEPETICH continued to pressure employees to add RPP panels to patient requisitions for COVID-19 testing received from medical clinics.  According to Employee 3, the day before, LEPETICH had sent her employees a list of patients that LEPETICH said needed a respiratory panel.  After contacting one of the ordering clinics, Employee 3 was told that none of their patients required a respiratory panel.

111)    On June 15, 2020, the Investigative Team interviewed Person 1.  Person 1 has experience working for diagnostic laboratories.  S/he was recently recruited by LEPETICH to work as a sales representative for MEDLOGIC.

112)    Person 1 stated that LEPETICH emailed her/him using the TARGET ACCOUNT.

113)    On June 12, 2020, an "HR Manager" for MEDLOGIC sent an email to Person 1 regarding an "Offer of Employment," copying LEPETICH at the TARGET ACCOUNT.  The email offered that Person 1, upon meeting certain revenue quotas, would be paid a percentage of the gross reimbursements received by MEDCOMP from health care benefit programs.



XII.    **PROBABLE CAUSE TO SEARCH THE TARGET ACCOUNT**

114)    On November 27, 2019 and May 14, 2020, the Investigative Team served GoDaddy, the provider of the TARGET ACCOUNT, with preservation letters under Title 18, United States Code, Section 2703(f), requesting that GoDaddy preserve all electronically stored information in its possession regarding the TARGET ACCOUNT for a period of ninety days.[2]

---

[2] Affiant determined that GoDaddy hosts the TARGET ACCOUNT by utilizing an Internet Service Provider look-up tool.

115)    The Investigative Team reviewed emails sent to or from the TARGET ACCOUNT, and these emails and other evidence establish probable cause to believe that the TARGET ACCOUNT will contain records and communications relating to the TARGET OFFENSES.

116)    The signature block used by LEPETICH on several emails reviewed by Affiant lists the TARGET ACCOUNT.

> Malena Lepetich
> President/CEO
> MedLogic, LLC
> P. 225-615-8970
> F. 225-615-8974
> C. 337-319-1431
> 340 East Parker St., Baton Rouge, LA 70803
> mbadon@medlogicus.com
> www.medlogicus.com

117)    As noted above, Sales Representative 1 confirmed that s/he communicated with LEPETICH via phone, text message, and email at "mbadon@medlogicus.com" (i.e., the TARGET ACCOUNT).

118)    Affiant reviewed emails dating back to at least October 2015, and as recently as June 2020, in which LEPETICH used the TARGET ACCOUNT.  For example, on October 28, 2015, LEPETICH used the TARGET ACCOUNT to receive a "compliance checklist" for MEDLOGIC.



119)    On August 14, 2017, Doctor 2 sent an email to LEPETICH at the TARGET ACCOUNT to raise grievances with her and to let her know s/he would be "filing suit."

From: ████████████████████████████████
**Sent:** Monday, August 14, 2017 11:56 AM
**To:** Malena Lepetich; ████████████
**Subject:** new doc 2017-08-14 11.55.22

Fraud and filing suit

120)   LEPETICH also listed the TARGET ACCOUNT in "lease" agreements with physicians, including in agreements dated June 1, 2018, August 1, 2018, and August 13, 2019.

MedLogic, L.L.C.
340 East Parker St
Baton Rouge, Louisiana, 70803
Telephone: 225-615-8970      Fax: 225-615-8974
Email: mbadon@medlogicus.com
(The "Tenant")

121)   Affiant obtained several emails in which LEPETICH used the TARGET ACCOUNT to correspond with Cooperating Witness 1.   For example, on April 12, 2017, LEPETICH used the TARGET ACCOUNT to request a "report" from Cooperating Witness 1 on "the number of patients we collected on for the month of march."

**From:** Malena Lepetich <mbadon@medlogicus.com>
**Subject:** Report
**Date:** April 12, 2017 at 11 05 08 AM EDT
**To:** ████████████████████████████

I need a report for the following:

Beyond Words- Dr Lakisha Williams

Premium Care Medical Center- Dr Chukwonomnso Dennar, Dr Princess Dennar

I need the number of patients we collected on for the month of march on this report.

122)   On April 27, 2017, LEPETICH, using the TARGET ACCOUNT, emailed Cooperating Witness 1 a "Lab Enrollment Form" for a clinic in Pennsylvania.  The form contained the clinic's name, address, phone number, ordering information, and the name and, purportedly, signature of the ordering physician.



123)     A person associated with Cooperating Witness called the clinic and heard that the physician "did not sign" this form.



124)     Also on April 27, 2017, LEPETICH used the TARGET ACCOUNT to send a "Respiratory sign up form" to Cooperating Witness 1.



125)     LEPETICH used the TARGET ACCOUNT to receive reports from Cooperating Witness 1 tracking specimens that were referred by LEPETICH to Acadian for testing.  For example, on March 14, 2018, LEPETICH received an email from Cooperating Witness 1, at the TARGET ACCOUNT, showing the amount paid by Medicaid and other insurers on specimens referred for testing by LEPETICH.

31



| MA Sales Rep | Referring Provider | Patient Name | Payer Name | Date of Service | Charges | Payments | Check Date | Procedure Code | Location Name |
|---|---|---|---|---|---|---|---|---|---|
| MedLogic | | | United Healthcare | 09/27/2017 | $153.00 | $17.00 | 10/25/2017 | 80348 | ACADIAN DIAGNOSTIC LABORATORIES |
| MedLogic | | | United Healthcare | 09/27/2017 | $74.00 | $15.48 | 10/25/2017 | 80325 | ACADIAN DIAGNOSTIC LABORATORIES |
| MedLogic | | | United Healthcare | 09/27/2017 | $98.00 | $17.00 | 10/25/2017 | 80356 | ACADIAN DIAGNOSTIC LABORATORIES |
| MedLogic | | | United Healthcare | 09/27/2017 | $100.00 | $16.50 | 10/25/2017 | 80346 | ACADIAN DIAGNOSTIC LABORATORIES |
| MedLogic | | | United Healthcare | 09/27/2017 | $85.00 | $16.50 | 10/25/2017 | 80357 | ACADIAN DIAGNOSTIC LABORATORIES |

126) Based on Affiant's review of emails and the prevalence of emails in today's age to communicate, probable cause exists to search the information described in Attachment A for evidence, instrumentalities, and fruits of the TARGET OFFENSES, further described in Attachment B.

## XIII. TECHNICAL BACKGROUND AND ITEMS LIKELY TO BE FOUND

127) GoDaddy provides its subscribers, such as LEPETICH, with internet-based accounts that allow them to send, receive, and store emails online. GoDaddy's accounts are typically identified by a single username, which serves as the subscriber's default email address, but which can also function as a subscriber's username for other services, such as instant messages and remote photo or file storage.

128) Based on my training and experience, I know that GoDaddy allows subscribers to obtain accounts by registering on a website. During the registration process, GoDaddy asks subscribers to create a username and password, and to provide basic personal information such as a name, phone number, and in some cases a means of payment.

129) Once a subscriber has registered an account, GoDaddy provides email services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. GoDaddy

subscribers can also use that same username or account in connection with other services provided by GoDaddy.

130)    In general, user-generated content (such as email) that is written using, stored on, sent from, or sent to a GoDaddy account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an email, the email can remain on GoDaddy's servers indefinitely.  Even if the subscriber deletes the email, it may continue to exist on GoDaddy's servers for a certain period of time.

131)    A subscriber's GoDaddy account can be used not only for email but also for other types of electronic communication, including instant messaging, photo and video sharing, voice calls, video chats, and SMS text messaging.  Depending on user settings, user-generated content derived from many of these services is normally stored on GoDaddy's servers until deleted by the subscriber.  Similar to emails, such user-generated content can remain on GoDaddy's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on GoDaddy's servers for a certain period of time.  Furthermore, a GoDaddy subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on GoDaddy's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a GoDaddy account may be found within such computer files and other information created or stored by the GoDaddy subscriber.  Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

132)    Based on my training and experience, I know that providers such as GoDaddy also collect and maintain information about their subscribers, including information about their use of GoDaddy services.  This information can include the date on which the account was created, the

length of service, records of log-in (i.e., session) times and durations, the types of service utilized,

the status of the account (including whether the account is inactive or closed), the methods used to

connect to the account (such as logging into the account via the provider's website), and other log

files that reflect usage of the account. Providers such as GoDaddy also commonly have records

of the Internet Protocol address ("IP address") used to register the account and the IP addresses

associated with other logins to the account. Because every device that connects to the Internet

must use an IP address, IP address information can help to identify which devices were used to

access the relevant account. Also, providers such as GoDaddy typically collect and maintain

location data related to subscribers' use of GoDaddy services, including data derived from IP

addresses and/or Global Positioning System ("GPS") data.

133)    Based on my training and experience, I know that providers such as GoDaddy also

collect information relating to the devices used to access a subscriber's account—such as laptop

or desktop computers, cell phones, and tablet computers. Such devices can be identified in various

ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the

specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a

particular user account for cellular data or voice services, and some identifiers are actually assigned

by GoDaddy in order to track what devices are using GoDaddy's accounts and services. Examples

of these identifiers include unique application number, hardware model, operating system version,

Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone

number, Media Access Control ("MAC") address, and International Mobile Equipment Identity

("IMEI"). Based on my training and experience, I know that such identifiers may constitute

evidence of the crimes under investigation because they can be used (a) to find other GoDaddy

accounts created or accessed by the same device and likely belonging to the same user, (b) to find

other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the GoDaddy account.

134)    Based on my training and experience, I know that providers such as GoDaddy use cookies and similar technologies to track users visiting GoDaddy's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to GoDaddy.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as GoDaddy may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a GoDaddy account and determine the scope of criminal activity.

135)    Based on my training and experience, I know that GoDaddy maintains records that can link different GoDaddy accounts to one another, by virtue of common identifiers, such as common email addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple GoDaddy accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who used a particular GoDaddy account.

136)    Based on my training and experience, I know that subscribers can communicate directly with GoDaddy about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as GoDaddy typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

137)    In summary, based on my training and experience in this context, I believe that the computers of GoDaddy are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved email), as well as GoDaddy-generated information about its subscribers and their use of GoDaddy services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide GoDaddy with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

138)    Information stored in connection with a GoDaddy account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with a GoDaddy account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email

communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by GoDaddy can show how and when the account was accessed or used. For example, providers such as GoDaddy typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the GoDaddy account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the GoDaddy account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## XIV.  **RETENTION OF INFORMATION FOR AUTHENTICATION PURPOSES**

139)    In anticipation of litigation relating to the authenticity of data seized pursuant to the search warrant, the government requests that it be allowed to retain a digital copy of all seized information authorized by the warrants for as long as is necessary for authentication purposes.

## XV.  **CONCLUSION**

140)    Based on the forgoing, there is probable cause to believe that from in or around April 2017, and continuing through the present, LEPETICH used the TARGET ACCOUNT in furtherance of the TARGET OFFENSES. There is also probable cause to search the information

described in Attachment A for evidence, instrumentalities, and fruits of these crimes, further described in Attachment B.

141)    Because the warrant will be served on GoDaddy, which will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
Jeff Richards
Special Agent
U.S. Department of Health and Human Services
Office of Inspector General

Affidavit submitted by email/pdf. and attested to me as true and accurate by telephone consistent with Federal Rules of Criminal Procedure 4.1 and 41(d)(3) on the 14th day of July, 2020.

_____
**HONORABLE ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with the TARGET ACCOUNT, identified by "mbadon@medlogicus.com", which is stored at premises owned, maintained, controlled, or operated by GoDaddy.com, LLC, an email, website, and cloud services provider that accepts service of legal process at 14455 N. Hayden Road, Suite 219, Scottsdale, Arizona, 85260.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed By GoDaddy.com, LLC (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any records that have been deleted but are still available to the Provider, or have been preserved pursuant to the requests made under 18 U.S.C. § 2703(f) on November 27, 2019 and May 14, 2020, the Provider is required to disclose the following information to the government corresponding to the TARGET ACCOUNT listed in Attachment A:

a.      The contents of emails, including attachments, associated with the account from April 2017 to the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      Records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, and other identifiers, records of session times and durations, the date on which the account as created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      Records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

   e.  Records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

   Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

**II. Information to Be Seized by the Government**

   The following information, from April 2017 to the present:

   a.  Emails and documents relating to the referral of patients for laboratory testing, ordering of testing, testing, and billing or collection of payment for testing;

   b.  Emails and documents relating to the purchase, establishment, ownership, use, maintenance of, and inspection of drug testing devices and machines;

   c.  Emails and documents relating to the submission of insurance claims for reimbursement, the acceptance or denial of such claims, and the receipt and deposit of reimbursements;

   d.  Emails and documents relating to patient billings, such as itemized billing records, Explanation of Benefit forms, and correspondence to and from patients;

   e.  Emails and documents relating to insurance training manuals, provider manuals, regulations, bulletins, reports, newsletters, notices, pamphlets, handbooks, and correspondence relating to proper billing and documentation procedures and any emails or other documents regarding instructions for billing insurance providers or carriers, such as Medicare and Medicaid;

   f.  Emails and documents relating to any public or private insurance audits, such as notifications from insurance providers requesting supporting documentation, alerts

regarding billing and coding practices, audit findings, documents relating to overpayment recoveries, and related correspondence;

g.  Emails and documents relating to employee files and personnel files of employees or contractors, including licensed medical professionals, medical assistants, coding/billing staff, and administrative staff, such as applications for employment, employment contracts, employee and contactor work schedules, salaries and compensation, bonuses, time sheets, reference/background checks, professional certifications, training, performance evaluations, disciplinary actions, licensure, improvement plans, and payroll records;

h.  Emails and documents relating to employee training materials—formal or informal—including marketing materials, manuals, guides, memoranda, notes, emails, and other materials that provide employees information about how to perform their job functions;

i.  Emails and documents relating to policies, internal guidelines, standards of practice, and procedures for the practice of medicine;

j.  Emails and documents relating to financial records showing payment, receipt, concealment, transfer, or movement of money;

k.  Emails and documents relating to corporate, business and personal tax returns, including quarterly employment tax returns, withholding records, W-2s, and Internal Revenue Service Forms 1099;

l.  Emails and documents identifying receipt, transfer, or disposition of proceeds;

m.  Emails and documents identifying any businesses or corporations in which LEPETICH has a financial relationship with, investment stake in, ownership of,

4

controlling interest of, or management in, including contracts, articles of incorporations, shareholder agreements, offering memoranda, or memoranda of understanding; and

n.    Emails, contracts, agreements, and documents between LEPETICH, her businesses, and any third party, including billing agreements, professional services agreements, rent payment agreements, or independent contractor agreements.